# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

JEAN STOCKLEY, BRIANNA WILLIAMS, )
ELIZABETH BURNS, LORETTA MUNFORD, )
DOROTHY ARDS, LEE SEVIGNY, JENNA )
HAINES, MAUREEN LOVE, SEAN )
CHAMBERS, and TAYLOR SIMMS, )
individually and on behalf of all others )
similarly situated, )    **Case No. 3:22-cv-00709**
)    **Judge Aleta A. Trauger**
     Plaintiffs, )
)
v. )
)
NISSAN OF NORTH AMERICA, INC., )
)
     Defendant. )

## MEMORANDUM

     Nissan North America, Inc. ("Nissan") has filed a Motion to Dismiss (Doc. No. 34), to which the plaintiffs have filed a Response (Doc. No. 44), and Nissan has filed a Reply (Doc. No. 49). For the reasons set out herein, the motion will be granted in part and denied in part.

## I. BACKGROUND[1]

     Each of the ten plaintiffs owns a Nissan Rogue or Nissan Rogue Sport with a model year from 2017 to 2020. (Doc. No. 25 ¶¶ 10–53.) Those vehicles were equipped with a type of transmission known as a "continuously variable transmission," or "CVT," which is the focus of this case. (*Id.*) A transmission is a system that, to simplify matters somewhat, "transmit[s] the power from [the vehicle's] engine to the wheels." *Ekstrom v. United States*, 21 F. Supp. 338, 343 (Ct. Cl. 1937). Ordinary driving requires the wheels of the vehicle to receive different levels of power in different situations, depending on the need for acceleration, speed, or struggle against

---
[1] All factual allegations are from the plaintiffs' Second Amended Class Action Complaint (Doc. No. 25) and are accepted as true for the purposes of the Motion to Dismiss.

an incline. A transmission, therefore, must be capable of transmitting power at those different levels. Of course, "the rotational speed of a wheel may be increased simply by increasing the operating speed of the motor." *Solomon Techs., Inc. v. Int'l Trade Comm'n*, 524 F.3d 1310, 1318 (Fed. Cir. 2008). As a practical matter, though, controlling a vehicle's power solely by pushing or pulling back on the speed of the motor would be far from ideal. A transmission solves that problem by providing an intermediary system that allows the driver (or an automated assistant) to "increase or decrease the output speed by engaging either a high gear or a low gear." *Id.* With a conventional transmission, this talk of "gears" is literal; the transmission system contains a particular number of gears, and the rate of transmission is changed by shifting between the available "gear ratios." *See Eaton Corp. v. ZF Meritor LLC*, No. 03-74844, 2006 WL 6209926, at *2 (E.D. Mich. Aug. 14, 2006). A set number of gears, however, means a set number of ratios that the transmission must, in effect, hop between, without the option to precisely target the particular, exact transmission rate ideal for a given situation. A CVT attempts to avoid that limitation by replacing this conventional system of gears with an alternative structure that "allows a wheel to be driven at a continuous range of different rotational speeds"—that is, the equivalent of "an infinite number of gear ratios." *Solomon Techs.*, 524 F.3d at 1318. The Nissan CVT in the plaintiffs' vehicles accomplishes this task by relying on "a segmented steel belt between pulleys that can be adjusted to change the reduction ratio in the transmission." (Doc. No. 25 ¶ 2.)

The plaintiffs, however, say that the Nissan CVT was defective. They are not alone in having reached that conclusion; there have been a number of lawsuits filed regarding the Nissan CVT, including multiple cases in this court. *See, e.g.*, *Busler v. Nissan N. Am., Inc.*, No. 3:22-CV-00769, 2023 WL 5424284, at *2 (M.D. Tenn. Aug. 22, 2023); *Norman v. Nissan N. Am.*, No.

2

3:18-CV-00534, 2022 WL 469076, at *1 (M.D. Tenn. Feb. 15, 2022). The lawsuits, however, have been marked by some degree of uncertainty regarding what, exactly, is supposedly wrong with the Nissan CVT—other than the general allegation that the system, as a whole, is prone to malfunction. These plaintiffs define the "CVT Defect" simply to be "one or more design and/or manufacturing defects that can cause [the CVT] to malfunction" in the manners that they describe in their Second Amended Complaint. (Doc. No. 25 ¶ 2.) Outside of that fundamentally circular definition, however, they do not offer a definitive account of the physical, mechanical details of how or why those malfunctions are occurring, although they do acknowledge a few more specific problems connected with CVT malfunctions, such as buildup of metal debris, leaks of transmission fluid, and "belt slippage." (*Id.* ¶ 71–75.)

What the plaintiffs lack in overall specificity, they seek to make up for with a wealth of anecdotal evidence of the transmission's problems, whatever their root cause. As the plaintiffs point out, "[n]umerous [Rogue] owners have reported a significant delay in their [vehicle's] response while attempting to accelerate . . . both from a stop and while in motion[,] . . . often accompanied by the engine revving while the driver depresses the gas pedal with little to no increase in vehicle speed." (*Id.* ¶ 3.) Drivers have also reported "stalling, jerking, lurching, juddering, and/or shaking" during ordinary operation. (*Id.*) The fact that many Nissan drivers have voiced such complaints is a matter of public record, confirmed by the National Highway Traffic Safety Administration ("NHTSA"). (*See id.* ¶ 85 (collecting consumer complaints to NHTSA).)

The plaintiffs allege that Nissan was aware of the Rogue's CVT issues but "actively concealed the true nature and extent" of the problem. (*Id.* ¶ 7.) The CVT found in the relevant Rogue models was, the plaintiffs point out, "the same or [a] substantially similar transmission"

3

as was included in "earlier model Nissan vehicles equipped with a CVT, including, but not limited to, the 2014-2018 Nissan Rogue" (*Id.* ¶ 69.) Nissan's experiences with those vehicles—as well as its later experiences with the Rogue models at issue in this case—would have unavoidably alerted the company to the system's problems in a number of ways, the plaintiffs allege. First, the CVT's poor functioning and tendency to fail should have been apparent from "pre-production testing, pre-production design failure mode and analysis data, [and] production design failure mode and analysis data." (*Id.* ¶ 64.) Then, once vehicles using the CVT were on the road, Nissan would have received "early consumer complaints made exclusively to Nissan's network of dealers and directly to Nissan." (*Id.*) As more and more drivers experienced the problem and sought repairs, the frequency of those repairs would have appeared in the "aggregate warranty data compiled from Nissan's network of dealers," as well as "repair order and parts data received by Nissan" from the dealers. *Id.*

The plaintiffs allege that Nissan actively monitors these data sources—as it would certainly make sense for a vehicle manufacturer to do. (*Id.* ¶¶ 65–66.) They also cite various actions by Nissan and its executives seeming to confirm either this general policy of oversight or specific awareness of issues related to the CVT. For example, in 2018, Nissan Senior Manager James Blenkarn publicly confirmed that Nissan closely monitors evidence of vehicle malfunctions, stating that, "[f]or the first six months, sometimes longer, of every new product, we have a team that focuses strictly on the product and examines every claim that comes in for that vehicle model." (*Id.* ¶ 65.) In 2013, Nissan CEO Carlos Ghosn "announced that Nissan would increase its oversight of CVT supplier JATCO, Ltd.," because "customer service issues had begun to cut into Nissan's profits." (*Id.* ¶ 67.) Nissan also "extended the 2014-2018 Rogue Powertrain Warranty from five years/60,000 miles to seven years/84,000 miles and offered to

4

reimburse owners and lessees who paid for transmission-related repairs during the extended warranty period in connection with a class action settlement."[2] (*Id.* ¶ 69.)

The plaintiffs also allege that Nissan Technical Service Bulletins, or "TSBs," issued by Nissan to its dealers demonstrate an awareness of problems with the CVT system. (*Id.* ¶ 70.) Several of these TSBs have been appended to the Amended Complaint. For example, an April 1, 2016 TSB specifically addressed what to do when "[t]he customer reports a transmission judder (shake, shudder, single or multiple bumps or vibration)." (Doc. No. 25-1 at 55.) The TSB acknowledged that the solution might be to wholly replace the CVT assembly. (*Id.* at 56.) Multiple TSBs addressed the tendency of metal debris to collect in the CVT, potentially damaging the system. (*E.g., id.* at 21, 29, 37.)

The plaintiffs have also provided the text of numerous complaints that were received by the NHTSA Office of Defects Investigation ("ODI"), *see* 49 C.F.R. § 554.5, regarding the Rogue CVT. For example:

> **NHTSA ID:10870850**
> **Incident Date: May 17, 2016**
> **Complaint Date: May 25, 2016**
> NISSAN IS COVERING-UP A VERY SERIOUS AND ON-GOING PROBLEM WITH ITS CVT TRANSMISSION. I BOUGHT A 2014 NISSAN ROGUE NEW IN MAY 2014. THE VEHICLE NOW HAS 70,700 MILES ON IT. AFTER ONLY 24 MONTHS, THE CVT TRANSMISSION FAILED AND, ACCORDING TO THE LOCAL NISSAN DEALERSHIPS, I NEED A NEW TRANSMISSION AT A COST OF $4,000. THE NISSAN DEALERSHIP IMPLIED (BUT WOULD NOT STATE DIRECTLY) THAT THERE IS A PROBLEM WITH NISSAN'S CVT TRANSMISSION WHICH HAS BEEN ON-GOING FOR 10+ YEARS. HOWEVER, MY CAR IS OUT OF WARRANTY AND I MUST PAY FOR THE NEW TRANSMISSION. THE TRANSMISSION SHOULD NOT FAIL AFTER 24 MONTHS. NISSAN SHOULD ADDRESS THE SYSTEMIC PROBLEM WITH ITS CVT TRANSMISSIONS AND EXTEND ITS WARRANTY FOR CVT

---

[2] Rule 408 of the Federal Rules of Evidence forbids the introduction of evidence involving a settlement for certain purposes, but it "does not preclude the introduction of evidence relating to settlements and compromises for other purposes, such as showing notice." *Klauber v. VMware, Inc.*, 80 F.4th 1, 8 (1st Cir. 2023).

TRANSMISSIONS AS IT DID IN 2010 FOR NISSAN VEHICLES IN MODEL YEARS 2003 TO 2010. . . .

**NHTSA ID: 10872189**
**Incident Date: May 28, 2016**
**Complaint Date: June 2, 2016**
FOR THE THIRD TIME MY NISSAN ROGUE 2014 FAILED TO ACCELERATE AS THE CVT TRANSMISSION SLIPPED AND WOULD NOT RE ENGAGE. TO MAKE MATTERS WORSE I WAS STUCK ON A MOUNTAIN ON A 95 DEGREE DAY WITH NO CELL PHONE SERVICE. THE VEHICLE HAS 28,000 MILES CURRENTLY. THIS FIRST TIME [IT] HAPPENED IT HAD 9,000 MILES. THERE IS A LAWSUIT FOR 2013-14 PATHFINDERS BUT THE ROGUES SHOULD BE INCLUDED IN A RECALL FOR VEHICLES UNFIT FOR OPERATION. IT IS A SAFETY HAZARD TO HAVE A VEHICLE TRAVELING AT 70MPH LOSE ACCELERATION CAPABILITIES AND STOP MOVING FORWARD. I WAS ALMOST REAR ENDED AND DROVE OFF OF THE ROAD. I'VE FILED A COMPLAINT WITH THE BBB AS WELL AS THE CORPORATION AND REQUESTED TO BE ABLE TO RETURN THE VEHICLE WITH NO FURTHER [COSTS]. THIS REQUEST WAS DENIED SO I AM FORCED TO OWN A VEHICLE THAT IS UNSAFE AND THE COMPANY REFUSES TO TAKE RESPONSIBILITY FOR. THERE WERE NO FATALITIES THIS TIME BUT I CAN'T SAY THE SAME FOR MY NEXT DRIVE TO THE STORE. MANY PEOPLE HAVE FILED COMPLAINTS ON THESE MODELS AND NOTHING IS BEING DONE TO ENSURE SAFETY . . . .

**NHTSA ID: 11063166**
**Incident Date: November 2, 2017**
**Complaint Date: January 16, 2018**
AS I WAS TRAVELLING ON A MAJOR FREEWAY, MY BRAND NEW 2016 NISSAN ROGUE BEGAN TO FEEL LIKE IT WAS "JUMPING." AT THAT POINT I NOTICED MY RPMS WERE HIGH FOR THE SPEED I WAS GOING. NOT EVEN 30 SECONDS AFTER, MY CAR COMPLETELY STALLED. I WAS IN THE FAST LANE OF THE FREEWAY AND BARELY HAD TIME TO REACT. I ENDED UP STUCK ON THE MEDIAN OF THE FREEWAY. I ENDED UP HAVING THE CAR TAKEN TO THE DEALER DOWN THE ROAD. THEY SAID THEY COULDN'T FIND ANYTHING WRONG WITH IT. I REFUSED TO DRIVE IT AND BEGAN SEEKING FURTHER HELP THROUGH NISSAN CONSUMER AFFAIRS. AFTER NEARLY A MONTH, AN ENGINEER FROM NISSAN TOOK 5 MINUTES TO LOOK AT IT AND NOTICED THE TRANSMISSION WAS SLIPPING. THE PREVIOUS WEEK BEFORE THIS MAJOR INCIDENT, THE CAR . . . STALLED A FEW BLOCKS FROM MY HOME ON A RESIDENTIAL STREET AFTER ACCELERATING FROM A COMPLETE STOP. THE DEALERSHIP HAD TOLD ME THERE WAS NOTHING WRONG WITH IT

AND IT WAS SAFE TO DRIVE. NOW HERE WE ARE 2 MONTHS LATER,
AND IT FEELS AS IF THE TRANSMISSION IS SLIPPING AGAIN.

(Doc. No. 25 ¶ 85.) The plaintiffs allege that Nissan would have been aware of these complaints because automobile manufacturers "monitor the NHTSA database for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including safety-related defects." (*Id.* ¶ 84.)

On September 13, 2022, the plaintiffs filed a putative Class Action Complaint against Nissan and Nissan Motor Co., Ltd. pursuant to the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301–12, and the laws of their respective states. (Doc. No. 1.) The plaintiffs hope to represent a nationwide class consisting of "[a]ll persons or entities who purchased or leased any MY2019-2022 Nissan Rogue or MY2017-2022 Nissan [Rogue] Sport vehicle in the United States," as well several state-based subclasses consisting of plaintiffs in Florida, Georgia, Illinois, Maryland, Massachusetts, New York, North Carolina, Ohio, Tennessee, and Texas. (Doc. No. 25 ¶ 103.) They state twenty-seven causes of action, variously under the Magnuson-Moss Warranty Act and the laws of those respective states involving consumer protection, express and implied warranties, unjust enrichment, negligence, and/or fraud. (*Id.* ¶¶ 110–422.) On May 8, 2023, Nissan filed a Motion to Dismiss directed at all claims. (Doc. No. 34.)

## II. LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that the plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and

the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

Additionally, Rule 9(b) of the Federal Rules of Civil Procedure states that "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This standard applies to all claims that "sound in fraud," including statutory claims incorporating fraud principles. *Ind.State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 942 (6th Cir. 2009). Generally speaking, a plaintiff seeking to comply with Rule 9(b) must "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 504 (6th Cir. 2007) (quoting *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003)). This heightened pleading standard is designed to prevent "fishing expeditions," to protect defendants' reputations from allegations of fraud, and to narrow potentially wide-

8

ranging discovery to relevant matters. *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 (6th Cir. 2011) (quoting *U.S. ex rel. SNAPP, Inc. v. Ford Motor Company*, 532 F.3d 496, 503 n.11 (6th Cir. 2008)).

## III. ANALYSIS

The pending Motion to Dismiss raises six general arguments. First, Nissan argues that the plaintiffs' fraudulent omission and consumer protection claims should be dismissed because the plaintiffs "do not meet their burden to plead facts identifying the purported defect or showing that [Nissan] was aware of the existence of that defect in their vehicles when they were sold." (Doc. No. 34 at 1.) Second, Nissan argues that various of the claims fail because they run afoul of state-specific doctrines, particularly those involving timeliness, notice, and restrictions on recovery for purely economic losses. Third, Nissan argues that all of the claims premised on implied warranties "are deficient because [the plaintiffs] allege no facts showing that their vehicles were either unmerchantable or inconsistent with their labeling." (*Id.* at 2.) Fourth, Nissan argues that the plaintiffs' express warranty claims should be dismissed because the plaintiffs have "fail[ed] to plausibly plead facts showing that [Nissan] was unable to or refused to repair a defect in materials or workmanship covered by the" warranty. (*Id.* at 2.) Fifth, Nissan argues that the plaintiffs' MMWA claims "must be dismissed if the predicate state law breach of warranty claim is dismissed." (*Id.*) Finally, Nissan argues that the court should dismiss all of the plaintiffs' claims for unjust enrichment on the ground that unjust enrichment is not available as a cause of action where the underlying transaction is already governed by an express contract, and each of the relevant vehicles was covered by a written warranty. (*Id.*)

9

**A. Nature and Pre-Sale Knowledge of the Defect**

1. Identification of a Specific Defect

Nissan argues that the court should dismiss the claims based on fraudulent omission and state consumer protection statutes on the ground that the plaintiffs "plead no facts identifying the supposed 'CVT Defect.'" (Doc. No. 35 at 9.) Nissan argues that the plaintiffs' theory of the case consists, in large part, of (1) identifying the vehicle system at issue—the CVT—and (2) describing various symptoms that are, because of their nature, apparently transmission-related and therefore attributable to that system. This approach, Nissan complains, falls short of identifying any actual defect—for example, by describing a specific mechanical malfunction that the CVT experiences, resulting in a discrete and identifiable product failure. Nissan complains that, rather than targeting an actual, identifiable defect, the plaintiffs are, in effect, "try[ing] to attribute virtually any problems that any consumer may experience with vehicle drivability to the so-called 'CVT defect.'" (*Id.* at 1.)

Nissan is correct that courts considering automobile defect cases typically require at least some level of meaningful detail regarding what the defect that the plaintiffs have alleged actually is—as opposed to simply the symptoms that it has caused. For example, in *Browning v. Am. Honda Motor Co.*, 549 F. Supp. 3d 996 (N.D. Cal. 2021), a federal district court dismissed claims brought by plaintiffs who, like these, alleged that their vehicles' transmission was "defective" because it caused certain unacceptable symptoms, but who "failed to plead facts beyond the symptoms of the alleged defects." *Id.* at 1006. The court did not hold that the plaintiffs were required to plead an exhaustive account of the physical processes at issue. The court concluded, however, that a plaintiff must, at a minimum, "identify the particular part affected by the defect and the [defect's] symptoms." *Id.* at 1006 (citing *Clark v. Am. Honda*

*Motor Co.*, 528 F. Supp. 3d 1108, 1115 (C.D. Cal. 2021)). The court held that the first of those requirements—identifying the "part affected"—required a greater level of specificity than simply "identify[ing] the [t]ransmission as the system affected by the defect," which "similarly situated courts ha[d]found . . . to be too general." *Id.* (citing *Callaghan v. BMW of N. Am., LLC*, No. 13-CV-04794-JD, 2014 WL 6629254, at *3 (N.D. Cal. Nov. 21, 2014); *DeCoteau v. FCA US LLC*, No. 215-CV-00020-MCE-EFB, 2015 WL 6951296, at *3 (E.D. Cal. Nov. 10, 2015)).

The court noted that a transmission "is composed of [numerous] component parts and interrelated systems" and that merely attributing a problem to the transmission system as a whole did little to give the defendant notice of what aspect of the transmission was actually alleged to contain a defect, let alone what the defect actually was. *Id.* Other district court decisions have similarly concluded that generic accounts of transmission problems were insufficiently specific to plead an actionable defect, at least under Rule 9(b). *See In re Ford Motor Co. DPS6 Powershift Transmission Prod. Liab. Litig.*, 483 F. Supp. 3d 838, 847 (C.D. Cal. 2020); *Callaghan*, 2014 WL 6629254, at *3; *DeCoteau*, 2015 WL 6951296, at *3. Still other decisions, however, have been skeptical of that approach and have found the identification of a defective vehicle system to be sufficient to state a claim. *See, e.g.*, *Zuehlsdorf v. FCA US LLC*, No. EDCV181877JGBKKX, 2019 WL 2098352, at *6 (C.D. Cal. Apr. 30, 2019) ("Here, while Plaintiff does not indicate how the alleged defect caused the reported symptoms, the Court finds his identification of the particular CVT affected . . . and description of the problems allegedly caused by the defect are sufficient to provide fair notice and allow Defendant to mount a defense.").

*Browning* and similar decisions are persuasive authority, and this court does not doubt the general proposition that a plaintiff alleging an automobile defect must identify the defect with

some degree of specificity, particularly when some of the claims he is pursuing sound in fraud and are therefore subject to Rule 9(b). In Nissan's briefing, however, it goes beyond treating such cases as the persuasive examples they are and treats them as, in effect, creating special pleading requirements for automobile defect cases that every plaintiff must satisfy. It is not clear to the court, however, why that should—or could—be the case. The pleading requirements for these causes of action, as with any cause of action, arise out of the application of the appropriate pleading standard to the substantive elements of the claims asserted—nothing more, and nothing less. In this instance, those pleading standards can be found in Rule 8 and Rule 9, not in any special law of automobile defect cases. Additional, special pleading requirements could only arise if they were a feature of affirmative law, set forth by an entity with the power to create such law—such as, for example, when Congress chose to impose "[e]xacting pleading requirements" on certain aspects of securities fraud claims. *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007).

Nissan, however, has not identified any basis for the special pleading requirement stating that a plaintiff who alleges that his transmission was defective absolutely *must* identify some faulty sub-component smaller than the transmission itself. It would be an inappropriate invasion of the powers of Congress, state legislatures, and state common law courts for this court to invent such a requirement. The court's analysis, therefore, can be informed by other district courts' conclusions in other cases, but it must always remain grounded in the intersection of Rule 8, Rule 9(b), and the relevant substantive causes of action—not some imagined federal common law of transmission defects.

Rule 9(b) raises the bar set by Rule 8, but the Sixth Circuit has stressed that it "should not be read to defeat the general policy of simplicity and flexibility in pleadings contemplated by the

12

Federal Rules." *SNAPP*, 532 F.3d at 504. "So long as a [plaintiff] pleads sufficient detail—in terms of time, place, and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *Id.* Those standards—not an *ad hoc* checklist assembled from other district court opinions—are what the plaintiffs are required to satisfy.

It is true that the Amended Complaint still leaves much unsaid regarding how and why the CVT malfunctioned in the ways that it allegedly did. There is a difference, though, between identifying a defect, as is required, and fully explaining that defect, which is not. *See Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220, 1237 n.60 (C.D. Cal. 2011) ("Plaintiff is not required to plead the mechanical details of an alleged defect in order to state a claim."). As a simplified example, one can imagine a hypothetical manufacturer choosing between two product materials—Material A and Material B—that are substantively identical in every way, except for the fact that Material B, for reasons entirely mysterious to the manufacturer, has a tendency to shatter into dangerous shards during normal use of the product. No reasonable person would argue that the manufacturer would be justified in using Material B simply because the manufacturer did not know, on some molecular level, *why* it was dangerous. What matters is that the manufacturer knew of the risk, knew there was an alternative, and took the risk anyway. Ordinary products liability law would not prevent a plaintiff from suing based on the selection of Material B, simply because no one knew precisely why Material B failed in the ways that it did.

What matters, in other words, is whether a product was defective and known to be so, not whether the plaintiffs, defendants, or anyone else can provide a mechanical explanation for why it was defective. That is particularly true when one is discussing a component that, like the CVT, is intended to replace a preexisting system that is already known to function comparatively

13

safely. What makes a product defective is not some physical feature of the product, in and of itself, but the fact that there is a "technologically feasible and practical alternative design that would have reduced or prevented the plaintiff's harm." *Evans v. Lorillard Tobacco Co.*, 465 Mass. 411, 428, 990 N.E.2d 997, 1014 (2013). If Nissan's CVT were the only transmission design in existence, then, perhaps, Nissan could plausibly argue that it should not be held liable for the system's dangerousness unless a plaintiff can identify a particular subcomponent that could be changed or replaced in order to make the product safer. Indeed, products liability law includes specific doctrines for such "unavoidably unsafe" products that, though dangerous, have no safer alternative. *See* Restatement (Second) of Torts § 402A comment k. Automobile transmissions, however, are not unavoidably unsafe in the manner at issue in this case. Reliably functioning transmissions preexisted the Nissan CVT. The absence of a reliably functioning transmission is, therefore, plausibly a vehicle defect—whether or not the plaintiff has a more detailed explanation of that defect.

The plaintiffs' pleading in support of the existence of such a defect is, moreover, voluminous. They have alleged, both repeatedly and in detail, the dangerous symptoms that the Nissan Rogue has allegedly exhibited on the road. They have explained why they believe that those symptoms were a result of the CVT, and they have alleged that such symptoms would not have occurred in a vehicle with a non-defective transmission. Maybe there is some small portion of the CVT that could, one day, be identified as an isolated "defect" and tweaked in order to create a safe, functioning transmission assembly. Or maybe the Nissan CVT, based on its overall design and the assumptions behind it, just does not work very well and never will. Either set of facts could be actionable, and any holding that the plaintiffs were required to plead facts

consistent only with the first theory would be a misapplication of both the substantive law and the relevant pleading standard.

The court also notes that, insofar as some higher degree of technical detail might be required, the plaintiffs have, in fact, pleaded such detail, even if they acknowledge that the more specific technical issues that they have identified do not necessarily account for all of the CVT's problems. For example, they have stated that "[b]locked or restricted flow" of transmission fluid cooler "can cause many of the issues experienced by Class Members, including hesitation, loss of power and a rough ride." (Doc. No. 25 ¶ 74.) They have alleged that such obstructions can occur due to the CVT's tendency to collect metal debris and "friction material." (*Id.*) Therefore, even if the court accepted Nissan's arguments regarding the standard for pleading a defect, those arguments would, at most, justify narrowing the plaintiffs' claims to those associated with the more detailed technical defect that they have identified. There would be no basis for outright dismissal.

The court, however, will not limit the plaintiffs' claims to those involving obstruction of transmission fluid cooler, because the pleading standard that Nissan asserts simply does not exist. No source of law—either substantive or procedural—required the plaintiffs to plead that the defect at issue in this case can be attributed to a specific subcomponent of the CVT or a specific mechanical process. The plaintiffs were, rather, required to state allegations sufficient to put Nissan on notice regarding the defect at issue, as well as particularized facts sufficient to support the plaintiffs' allegations of fraud. The plaintiffs have complied with those standards, as applied to identification of the defect.

15

2. Failure to Allege Prior Knowledge of the Defect

Nissan argues next that, insofar as the CVT was defective, the plaintiffs have not sufficiently alleged that Nissan was aware of that defect, as the laws of the relevant states would require in order for Nissan to be liable under many of the plaintiffs' causes of action. *See Wozniak v. Ford Motor Co.*, No. 2:17-CV-12794, 2019 WL 108845, at *3 (E.D. Mich. Jan. 4, 2019) (stating that "[l]iability cannot attach for a fraudulent omission theory under any state fraud or consumer protection law without a properly pleaded" allegation that the defendant knew about the relevant omitted fact). Nissan bases that argument, in part, on *Smith v. Gen. Motors LLC*, 988 F.3d 873, 875 (6th Cir. 2021), in which the Sixth Circuit affirmed a district court dismissal of vehicle defect claims based on a failure to sufficiently allege knowledge. The plaintiffs in *Smith*, like these plaintiffs, relied on the vehicle manufacturer's ongoing monitoring of customer complaints in order to support an inference of knowledge, and the Sixth Circuit concluded that the plaintiffs' allegations were, in that instance, insufficient. *Id.* at 883–85. The Sixth Circuit, however, did not hold that such a theory of prior knowledge categorically must fail. Rather, the Sixth Circuit based its conclusion on a specific deficiency in the history of customer complaints alleged. *Smith* involved allegedly defective dashboards that tended to crack and, potentially, "cause severe injuries because malfunctioning airbags could turn the plastic dashboards into deadly projectiles during a crash." *Id.* at 875. The Sixth Circuit concluded that the relevant customer complaints were insufficient to establish knowledge of dangerousness because they, at most, made the manufacturer aware of the first, far less serious aspect of the problem—cracks in the dashboard—but not "the safety implications of the dashboard defect." *Id.* at 885. In other words, the court concluded that it would be inappropriate to treat a manufacturer

16

that was aware of a seemingly cosmetic dashboard issue as also aware of an additional, but hidden, safety concern related to that issue.

*Smith* involved some strange procedural twists—particularly regarding the plaintiffs' agreement that the court should apply a particular, out-of-circuit pleading standard—that make it somewhat difficult to know how to apply it as a precedent. *See Smith*, 988 F.3d at 886 (Stranch, J., concurring in judgment) (explaining background). Even if one assumes that *Smith* governs these issues in full, however, *Smith* relied on a context-dependent analysis that cannot simply be imported into this situation. It is one thing to argue that an automobile manufacturer that is only on notice that its dashboards tend to crack is also on notice about a significantly more severe, but mostly latent, safety issue that is derivative of that problem. It makes a great deal less sense, however, when the argument is that an auto manufacturer could not have deduced a safety risk from its vehicles' failure to accelerate reliably in traffic. Moreover, even if Nissan had somehow been ignorant of the possibility of safety risks arising from the alleged transmission problems, the customer complaints to which it had access were more than enough to disabuse it of that ignorance.

Even when a claim is governed by the heightened pleading requirements of Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). *Smith* expressly acknowledged this fact, recognizing that the rule "permits general allegations about the defendant's knowledge to avoid a 12(b)(6) motion to dismiss." *Smith*, 988 F.3d at 883. It is a mistake, then, to read *Smith* as imposing some high evidentiary bar for the pleading of knowledge in an auto defect case. In fact, there is not an evidentiary bar at all, because a plaintiff, when drafting a complaint, "is not required to plead evidence," only assertions of fact. *McCall v. Scott*, 239 F.3d 808, 815 (6th Cir. 2001) (quoting *Brehm v. Eisner*,

746 A.2d 244, 254 (Del. 2000)). Despite the lengthy analysis that the Sixth Circuit undertook to reach its conclusion in *Smith*, the plaintiffs' failure was a simple one: they failed to plead a plausible allegation that the defendant was aware of the dangerous nature of the defect involved. There is no such deficiency here, and therefore no ground for dismissal under *Smith*.

In any event, even if a particularly heightened pleading standard applied to the plaintiffs' assertions of knowledge, they would have met that standard. The plaintiffs' allegations regarding Nissan's history with the CVT, including its history with substantially the same CVT system in earlier vehicles, plainly supports an inference of knowledge, and that inference is supported by both TSBs and consumer complaints. *See Gregorio v. Ford Motor Co.*, 522 F. Supp. 3d 264, 282 (E.D. Mich. 2021) (stating that knowledge can be inferred from applicable service bulletins). The supposed defects in those assertions that Nissan has identified are, at most, arguments about the sufficiency of the evidence of knowledge. A finder of fact might be swayed by the fact that there were not even more complaints to NHTSA than there were or that the TSBs do not outright acknowledge a defect. Those supposed shortcomings, however, do nothing to negate the sufficiency of the pleading under Rule 8 and Rule 9(b). The court, accordingly, will not dismiss any claims based on the plaintiffs' allegedly inadequate pleading of knowledge.

## B. State-Specific Defenses Regarding Damages and Timeliness

Nissan's next set of arguments involve various state-specific issues, most of which involve doctrines related to the sufficiency of non-physical damages in the product liability context. Some of these doctrines can be grouped under the broad heading of involving the "economic loss doctrine," although the use of that blanket term should not be misconstrued to suggest that what is at issue is a single rule that states have either adopted or declined to adopt. Rather, Nissan's arguments invoke a series of principles, espoused by the courts of different

18

states, that, although they mostly get at the same general cluster of issues, can be distinguished. The court, accordingly, will consider each argument separately.

### 1. Massachusetts Consumer Protection Act

Nissan argues that the court must dismiss Loretta Munford's claim under the Massachusetts Consumer Protection Act ("Mass. CPA"), on the ground that the Massachusetts Supreme Judicial Court, in a case involving allegedly defective door handles, held that a Mass. CPA products liability plaintiff who is suing about an allegedly defective vehicle but who "suffered [no] personal injury or property damage . . . must identify a legally required standard that the vehicles were at least implicitly represented as meeting, but allegedly did not." *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 633, 888 N.E.2d 879, 888 (2008). That supposed rule, the court explained, reflects the policy that, "when the injury alleged is purely economic, and there is a regulatory agency with relevant technical expertise and jurisdiction to provide relief for a problem that may affect many consumers, principles of primary jurisdiction may dictate that the agency 'should have an opportunity to consider the claim prior to a judicial hearing.'" *Id.* at 888 n.17 (quoting *Liab. Investigative Fund Effort, Inc. v. Med. Malpractice Joint Underwriting Ass'n of Massachusetts*, 409 Mass. 734, 751, 569 N.E.2d 797, 808 (1991)). Munford, the only named plaintiff asserting claims under Massachusetts law, has alleged that her Rogue malfunctioned in dangerous ways, but she does not allege that it actually injured anyone or destroyed anyone's property. (Doc. No. 25 ¶ 20.)

As the plaintiffs point out, however, multiple courts that have construed the Supreme Judicial Court's *Iannacchino* decision have rejected the aggressive reading that Nissan has drawn from the isolated language cited. The Eastern District of Michigan, for example, construed *Iannacchino* to set forth a rule only for cases in which plaintiffs' "sole theory of liability" was

19

that they "had been sold cars that were warranted to comply with a specific federal motor vehicle safety regulation, when in fact they did not comply." *In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-MD-02744, 2022 WL 998091, at *17 (E.D. Mich. Mar. 31, 2022). The District Court for the Northern District of California adopted a similar reading, concluding that the plaintiffs in *Iannacchino* did not fail because a regulatory violation is necessarily required to support a claim based on economic injuries, but because that theory happened to be the only one that the plaintiffs had pleaded in anything but a "conclusory" fashion. *See Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950, 962 (N.D. Cal. 2018). The District of Massachusetts construed the holding in *Iannacchino* to have depended on the fact that the plaintiffs "did not allege that their door handles had actually malfunctioned," only that they were dangerous in theory. *Costa v. FCA US LLC*, 542 F. Supp. 3d 83, 99 (D. Mass. 2021). Accordingly, any plaintiff who alleged actual "recurrent safety-related performance problems"—as these plaintiffs have—would not need to allege a specific regulatory violation. *Id.* at 100 (citation omitted).

This court's duty, confronted with this question of Massachusetts law, is to try to resolve it in the same manner that the Massachusetts Supreme Judicial Court, "if presented with the issue, would resolve it." *In re Fair Fin. Co.*, 834 F.3d 651, 671 (6th Cir. 2016) (quoting *Conlin v. Mortg. Elec. Registration Sys., Inc.*, 714 F.3d 355, 358–59 (6th Cir. 2013)). Although *Iannacchino* is somewhat ambiguous regarding its holding, this court ultimately agrees with the courts that have concluded that the case was not intended to apply to cases in which the plaintiff has pleaded the occurrence—not merely the possibility—of an actual product malfunction. The Supreme Judicial Court emphasized that the defining feature of the claims in *Iannacchino* was "the lack of accident-related injury *or* manifested defect." *Iannacchino*, 888 N.E.2d at 882 (emphasis added). Accordingly, while the specific language that Nissan cites can be read, in

20

isolation, to suggest that the court was setting forth a rule for a broader set of cases—specifically, all cases involving purely economic injuries—the only matter actually before the court was what rule should prevail when the case involves not only a lack of physical injuries, but also no manifestation of the underlying defect.

The Supreme Judicial Court's reasoning for putting so much emphasis on a potential regulatory violation, moreover, does not apply here. In *Iannacchino*, the court treated a regulatory violation as necessary because such a violation would be the only way to establish actual injury, which could then be measured "by the cost to bring the vehicles into compliance" with the relevant regulation. *Iannacchino*, 888 N.E.2d at 886–87. In a case such as this one, however, where a defect has actually manifested in an unsafe way, there is no need to resort to a regulatory violation in order to establish a need to replace the part at issue. The plaintiffs have plausibly alleged that they need to have their transmissions replaced for safety reasons, regardless of whether the transmissions are technically in compliance with regulations. The court, therefore, concludes that Massachusetts law likely does not require an allegation of a regulatory violation to support a Mass. CPA claim for economic damages, if the plaintiff has asserted an actual safety-related malfunction of the underlying product.

2. Maryland Consumer Protection Act

Courts have construed the Maryland Consumer Protection Act ("Md. CPA") to require that "[p]rivate parties who bring a suit must establish that they 'suffered an identifiable loss, measured by the amount the consumer spent or lost as a result of his or her reliance on the sellers' misrepresentation.'" *Chambers v. King Buick GMC, LLC*, 43 F. Supp. 3d 575, 621 (D. Md. 2014) (quoting *Green v. Wells Fargo Bank, N.A*, No. CIV.A. DKC 12-1040, 2014 WL 360087, at *4 (D. Md. Jan. 31, 2014)). This principle would not prevent a plaintiff from relying

21

on purely economic losses. It does, however, require losses that are "identifiable"; it is not enough to argue that the defendant committed a technical violation of the law and should be held liable "out of principle." *Green*, 2014 WL 360087, at *4. Nissan argues that Jean Stockley, who asserts Maryland-based claims, failed to allege injuries sufficient to meet this standard.

However, Maryland's highest court has expressly acknowledged that future necessary repairs are sufficient to constitute a loss under the Md. CPA. *See Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 149, 916 A.2d 257, 281, 288 (2007) (discussing loss "measured by the amount it will cost them to repair the defective seatbacks"). The plaintiffs have specifically alleged that Stockley "will have to bear" the price of a transmission replacement based on the malfunctions they have experienced. (Doc. No. 25 ¶ 187.) That is sufficient to state an identifiable injury and avoid dismissal.

### 3. North Carolina Unfair and Deceptive Trade Practices Act

Plaintiff Elizabeth Burns, who asserts a claim under the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA"), alleges that her vehicle has experienced potentially dangerous malfunctions, but she has not alleged that she was injured by the malfunctions or paid any sum of money to address the issue. (Doc. No. 25 ¶¶ 16–17, 117–27.) Nissan argues that such allegations are insufficient because NCUDTPA requires an allegation of "actual damages" that "proximately flow from the fraud or unfair and deceptive acts." *Rahamankhan Tobacco Enterprises Pvt. Ltd. v. Evans MacTavish Agricraft, Inc.*, 989 F. Supp. 2d 471, 478 (E.D.N.C. 2013) (collecting cases). However, North Carolina courts have defined injury broadly to include "the loss of any appreciated value of the property, and such other elements of damages as may be shown by the evidence." *Coley v. Champion Home Builders Co.*, 162 N.C. App. 163, 166, 590 S.E.2d 20, 22 (2004). Burns has adequately pleaded that she

22

suffered injuries in this broad sense, because she has specifically asserted that her vehicle has diminished in value due to the defective CVT and that she faces an "expected cost to replace their defective CVTs which, on information and belief, averages in the range of $3,500." (Doc. No. 25 ¶ 126.)

Nissan attempts to bypass the broad, ordinary definition of injury by relying on *Coker v. DaimlerChrysler Corp.*, 172 N.C. App. 386, 397, 617 S.E.2d 306, 313 (2005), *aff'd without opinion*, 360 N.C. 398, 627 S.E.2d 461 (2006), in which the North Carolina Court of Appeals held that "hypothetical" future repair costs and "unsubstantiated diminution" of value were insufficient to state judicially cognizable NCUDTPA claims. The relevant language in *Coker*, however, is not about what type of injury is required under the NCUDTPA, but what type of injury was, at the time, considered necessary to satisfy North Carolina's constitutional injury-in-fact requirement.[3] *Id.* However, North Carolina's standalone injury-in-fact requirement has since been abrogated for purely statutory claims, *Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*, 2021-NCSC-6, ¶ 74, 376 N.C. 558, 601, 853 S.E.2d 698, 729, leaving that section of *Coker* no longer good law.[4] It would certainly be to Nissan's benefit if the clear abrogation of *Coker* by the North Carolina Supreme Court could be circumvented by recharacterizing *Coker*'s holding as based in the text of the NCUDTPA, but that is not what the opinion actually says. The

---

[3] Nissan has not argued that Burns has failed to allege an injury sufficient to meet the U.S. Constitution's version of that requirement, and the court is not aware of any viable argument that would support such a position.

[4] Nissan suggests that *Coker* was abrogated "on other grounds" (Doc. No. 35 at 18), but that is not a fair characterization—or, at least, is not fair if one evaluates it based on what *Coker* was actually about, as opposed to how Nissan has represented it. The opinion of the court in *Coker* is abundantly clear that the issue under consideration was exclusively one of state-law constitutional standing. Indeed, the opinion of the court—in response to criticism in a dissent—expressly emphasized that the plaintiffs had failed to raise any argument that their claim might survive based on the text of the NCUDTPA. *See Coker*, 617 S.E.2d at 314 ("Plaintiffs did not argue statutory standing for their claim of unfair and deceptive trade practices either before the Business Court or this Court."). Later, when *Coker* was abrogated, the North Carolina Supreme was clear that the portion of the conclusion being abrogated was, in fact, the conclusion regarding standing. *See Comm. to Elect Dan Forest*, 853 S.E.2d at 729.

NCUDTPA requires only that the plaintiff be "injured," a broad term that, by its ordinary definition, would include both the reduced value of Burns' vehicle and her need for expensive repairs.

Next, Nissan argues that, even if Burns has pleaded actual damages, those damages are purely economic and therefore cannot be recovered in a product liability action pursuant to the NCUDTPA. Some courts have held that "North Carolina's 'economic loss rule' . . . prohibits the purchaser of a defective product from using tort law to recover purely economic losses." *Bussian v. DaimlerChrysler Corp.*, 411 F. Supp. 2d 614, 625 (M.D.N.C. 2006) (citations omitted); *see also In re Nissan N. Am., Inc. Litig.*, No. 3:19-CV-00843, 2022 WL 4793180, at *6 (M.D. Tenn. Sept. 30, 2022) (Campbell, J.) ("The economic loss doctrine bars the NCUDTPA claim. The fraud claim will proceed."). The North Carolina Supreme Court, however, has never definitively resolved whether the economic loss rule applies in the context of the NCUDTPA. The plaintiffs suggest that that court, if confronted with the issue, would ultimately hold that the rule does not apply, because North Carolina's economic loss rule applies only to contractual theories of recovery in which there is no separate statutory duty, such as the duties imposed by the NCUDTPA.

It is not uncommon for the economic loss doctrine to apply in products liability cases; to the contrary, products liability is, if anything, the paradigmatic area in which the economic loss doctrine is likely to be at issue. *See Com. Painting Co. Inc. v. Weitz Co. LLC*, No. W2019-02089-SC-R11-CV, 2023 WL 6304838, at *4 (Tenn. Sept. 28, 2023). Complicating matters, though, is the fact that the economic loss doctrine is a "judicially-created rule" arising out of common law principles of contract, *id.*, while claims under consumer protection acts are, in contrast, statutory in nature and created by legislatures. The NCUDTPA was enacted by the

North Carolina General Assembly, and it contains no economic loss doctrine in its actual text. Why, then, would that state's judiciary even have the power to impose such a limitation? As the court has discussed, there was, at one time, a basis under the North Carolina Constitution for recognizing certain non-statutory limitations on the types of damages cognizable under the NCUDTPA, but that basis—the state's own constitutional injury-in-fact requirement—has been expressly repudiated by that state's highest court. *See Comm. to Elect Dan Forest,* 853 S.E.2d at 729.

It is certainly possible that North Carolina's Supreme Court would conclude that the NCUDTPA implicitly incorporates the economic loss doctrine, despite its textual silence on the matter. There is, however, a relative lack of evidence to support such a prediction. In contrast, the U.S. District Court for the Central District of California surveyed this issue in 2021 and concluded that "[m]ost federal courts addressing the issue . . . have held that [the] economic loss rule does not bar claims arising under the [NCUDTPA]." *Cadena v. Am. Honda Motor Co.*, No. CV 18-4007-MWF (PJWx), 2021 WL 9839349, at *5 (C.D. Cal. Mar. 10, 2021) (citing *Ponzio v. Mercedes-Benz USA, LLC*, 447 F. Supp. 3d 194, 241 (D.N.J. 2020); *Sloan v. Gen. Motors LLC*, 2020 WL 1955643, at *26-27 (N.D. Cal. Apr. 23, 2020); *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 967 (N.D. Cal. May 30, 2014)); *see also Martin v. Bimbo Foods Bakeries Dist., LLC*, No. 5:15-CV-96, 2015 WL 1884994, at *7 (E.D.N.C. Apr. 24, 2015); *In re Caterpillar, Inc., C13 & C15 Engine Prod. Liab. Litig.*, No. 1:14-CV-3722 JBS-JS, 2015 WL 4591236, at *36 (D.N.J. July 29, 2015) *Yancey v. Remington Arms Co., LLC*, 2013 WL 5462205, at *10 n.13 (M.D.N.C. Sept. 30, 2013); *but see Bussian*, 411 F. Supp. 2d at 625.

Ultimately, this court agrees with those that have found it more likely than not that the economic loss rule is inapplicable to a statutory cause of action under the NCUDTPA. The rights

and duties created by the NCUDTPA are legislative in character, reflecting the judgment of the North Carolina General Assembly in the legitimate exercise of authority. The scope of those rights and duties arise out of the statute itself, not common-law notions about the best policy for apportioning risk. By its plain text, the NCUDTPA allows recovery for injuries—not simply non-economic injuries—and a holding to the contrary would violate the Act's language in direct contravention of the established powers of the North Carolina General Assembly. The court, accordingly, will not dismiss Burns' NCUDTPA claim.

### 4. Ohio Consumer Sales Practices Act

The Ohio Consumer Sales Practices Act ("OCSPA"), like some other state consumer protection statutes, includes a purported limitation on a plaintiff's right to pursue a class action based on injuries similar to his own arising out of the same underlying statutory violation. Specifically, "a consumer may qualify for class-action certification. . . only if the defendant's alleged violation of the Act is substantially similar to an act or practice previously declared to be deceptive by one of" two methods: a rule of the state's Attorney General or a publicly available ruling of an Ohio state court. *Marrone v. Philip Morris USA, Inc.*, 2006-Ohio-2869, ¶ 2, 110 Ohio St. 3d 5, 6, 850 N.E.2d 31, 33; *see* Ohio Rev. Code Ann. § 1345.09(B). Nissan argues that Taylor Simms' assertion of putative class action claims under OCSPA fails to satisfy that requirement.

Before the court can consider that argument, however, it must determine whether Ohio's class action limitation is enforceable in a federal court. The right to pursue a class action in federal court is not based on the underlying substantive law of the claim, but on Rule 23 of the Federal Rules of Civil Procedure, which, as federal law, is entitled to prevail over inconsistent state law. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 399 (2010)

26

(internal quotation omitted). Where a state procedural law instructs a federal district court to disregard Rule 23, then, the federal court typically must disobey that instruction as inconsistent with binding and applicable federal law governing the question presented. *Id.*

"That does not mean, however, that the federal rule always governs." *Id.* at 417 (Stevens, J., concurring in part and in judgment). That is because there is another way to think about state class action limitations like Ohio's that avoids a conflict with Rule 23. If one reads a statute such as Ohio's as an instruction to the courts regarding when claims may be presented through the class action form, then the statute is irreconcilable with the federal rules. If, however, one reads the state statute as purely substantive—stating, in effect, that such causes of action simply cease to exist when presented in the form of a class action—then there is no conflict, because Rule 23 would not call on a court to certify a class action full of nonexistent claims. *Id.*

The case in which the Supreme Court announced these principles had a divided majority, and courts have largely concluded that the scope of its holding is set by Justice Stevens' concurrence, which leaves open the possibility that some state class action limitations will survive in federal court on the ground that those limitations are substantive, rather than purely procedural. *See In re Target Corp. Data Sec. Breach Litig.*, 66 F. Supp. 3d 1154, 1165 (D. Minn. 2014) (collecting cases). Justice Stevens acknowledged that the resultant rule was "'hazy'" and would "require[] careful interpretation of the state and federal provisions at issue." *Shady Grove*, 559 U.S. at 419 (Stevens, J., concurring in part and in judgment) (quoting *Erie R. Co. v. Tompkins*, 304 U.S. 64, 92 (1938)). Generally speaking, though, Justice Stevens stated that the court should look to whether the state rule at issue is "so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy." *Shady Grove*, 559 U.S. at 420 (Stevens, J., concurring in part and in judgment).

Pursuant to that test, the OCSPA's class action limitation is substantive. If Ohio had flatly banned OCSPA class actions, then the viability of such a ban might present a close question. Ohio's rule, however, does not bar the actions; rather, it reserves to Ohio courts and the state's Attorney General the power to determine which unlawful practices should be subject to such large-scale enforcement actions. Courts, including this one, have found such considerations regarding the division of powers within a state's government to be a strong sign that a class action bar is substantive in nature. *See Bearden v. Honeywell Int'l Inc.*, No. 3:09-1035, 2010 WL 3239285, at *10 (M.D. Tenn. Aug. 16, 2010) ("[T]he class-action limitation reflects a policy that the proper remedy for a violation affecting a class of consumers is prosecution by the Attorney General . . . ."). Ohio's rule, therefore, applies to Simms' OCSPA claim, and she cannot pursue a class action unless the practice at issue is substantially similar to one that has been declared unlawful by either the Ohio Attorney General or the published decision of an Ohio court.

The plaintiffs argue that Simms has satisfied that requirement because prior judicial opinions put Nissan on notice that "concealing the CVT Defect and breaching its warranty obligations was unlawful." (Doc. No. 44 at 19.) For example, in *Williams v. Am. Suzuki Motor Corp.*, 2008-Ohio-3123, the Ohio Court of Appeals affirmed an OCSPA verdict in favor of a plaintiff who sued the manufacturer of his motorcycle, which he had argued was defective because of its recurring "backfiring, stalling, hesitation while in motion, and a strong raw fuel smell," which a dealership had been unable to fix. *Id.* ¶ 10. A similar claim involving various automobile malfunctions was affirmed in *Mason v. Mercedes-Benz USA, LLC*, 2005-Ohio-4296, ¶ 36. The plaintiffs argue that those decisions provided ample notice that it is actionable under the OCSPA to knowingly sell a consumer a defective vehicle and then fail to repair the vehicle when repairs were sought.

28

Neither of those decisions involved the Nissan CVT. The Ohio Supreme Court, however, does not require identicality in order for a defendant to be on notice for the purposes of the OCSPA. Rather, the court has construed "substantial similarity" to require "similarity not in every detail, but in essential circumstances or conditions." *Marrone v. Philip Morris USA, Inc.*, 2006-Ohio-2869, ¶ 24, 110 Ohio St. 3d 5, 10, 850 N.E.2d 31, 36 (citation omitted). Nissan, however, has identified only minor differences between the allegations at issue in *Williams* and *Mason* and Simms' own allegations. Specifically, the plaintiff in *Williams* sought repairs more times than Simms did, and the plaintiff in *Mason* experienced a wider range of defects. (Doc. No. 49 at 6–7.) Those distinctions might be relevant to the question of ultimate liability with regard to some theories, but they do not negate the notice that those cases provided regarding the underlying principle at issue.

In the alternative, Nissan argues that the court should dismiss Simms' claim on the ground that, even if those earlier court decisions did provide adequate notice, the plaintiffs did not sufficiently plead that that was the case. Both cases, however, are directly cited in the Amended Complaint (along with twelve others), and the plaintiffs explained that the relevant similarity is that those cases involved "the concealment and/or non-disclosure of a dangerous defect," just as this one does. (Doc. No. 25 ¶ 250.) That pleading was sufficient to put Nissan on notice regarding the content of Simms' argument regarding the class action bar.

### 5. Illinois Consumer Fraud Act

The Illinois Consumer Fraud Act ("ICFA") generally forbids the use of "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or

omission of such material fact, . . . in the conduct of any trade or commerce." 815 Ill. Comp. Stat. Ann. 505/2. Some courts applying that provision have suggested that, where a plaintiff asserts omission of a material fact, she must identify a "direct statement[] from [the defendant] that contain[s] material omissions." *Guajardo v. Skechers USA, Inc.*, No. 4:19-CV-04104-SLD-JEH, 2021 WL 4302532, at *3 (C.D. Ill. Sept. 21, 2021). Nissan argues that the plaintiffs have failed to satisfy that requirement.

The plaintiffs have alleged that "Nissan had multiple opportunities to disclose the CVT Defect to" the plaintiffs, but failed to do so. (Doc. No. 25 ¶ 292.) With regard to Illinois plaintiff Maureen Love, they have gone a step further and specifically allege that "Nissan could have included a disclosure in the Nissan-authored warranty booklet that Plaintiff Love viewed immediately before purchasing her vehicle in February 2020 from CarMax in Glendale, Illinois or in Nissan's television advertising that Plaintiff Love was exposed to shortly before purchasing her vehicle." (*Id.*) The plaintiffs do not, however identify specific statements within those materials from which the relevant information was omitted.

It is not difficult to imagine a case in which such allegations would be insufficient. For example, if Love were suing Nissan based on its failure to tell her that its vehicles lacked satellite radio, it would be appropriate to expect her to plead with more specificity what, if anything, Nissan said in order to make her *expect* that her vehicle would have satellite radio. Context, however, matters, and this case did not involve a minor omission regarding a secondary detail that any given driver might or might not care about; it involved alleged omission of the fact that the vehicle being advertised was dangerously defective. There is a plausible argument that the omission of such information from even fairly generic advertising and marketing materials is deceptive, in light of the seriousness of the risk, the manufacturer's superior knowledge, and the

30

consumer's reasonable expectations. *See In re Takata Airbag Prod. Liab. Litig.*, 193 F. Supp. 3d 1324, 1338 (S.D. Fla. 2016). The Illinois Supreme Court, moreover, has recognized that the ICFA's recognition of a cause of action for "omission or concealment of a material fact" imposes liability even in the absence of a showing necessary to give rise to the "common law duty to disclose," if the fact omitted "concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 505, 675 N.E.2d 584, 595 (1996) (citation omitted). Reading Love's allegations in the light most favorable to her, the court finds that she has sufficiently stated a claim that Nissan's failure to disclose the CVT defect in its exhortations that Love purchase a Nissan vehicle amounted to a deceptive act or practice under the ICFA.

### 6. New York Section 349

New York General Business Law § 349 "provides a private right of action to 'any person who has been injured by reason of'" a violation of that law. *City of New York v. Smokes-Spirits.Com, Inc.*, 12 N.Y.3d 616, 621, 911 N.E.2d 834, 837 (2009) (quoting N.Y. Gen. Bus. Law § 349(h)). Nissan does not dispute, at this juncture, that a person who purchased a Nissan Rogue with a defective CVT and experienced malfunctions requiring replacement would be "injured" for the purposes of section 349. The only named plaintiff asserting claims under New York law, however, is Sean Chambers, who did not purchase his vehicle, but inherited it from his deceased mother. (Doc. No. 25 ¶ 43.) The plaintiffs assert that Chambers "was heavily involved in the purchasing decision, and he assisted his mother through the process of choosing a vehicle and purchasing it." (*Id.* ¶ 44.) They do not, however, assert that Chambers contributed monetarily to the purchase or owned any interest in the vehicle prior to his mother's death. (*Id.*) Nor do they allege that Chambers has incurred any direct out-of-pocket expenses related to

31

repairing the vehicle. He did obtain a full CVT replacement, but that replacement was covered by the warranty. While that process was undoubtedly inconvenient—as it involved Chambers' being deprived of the use of his vehicle for three months—it was still, in terms of the service and parts themselves, free of cost. (*Id.* ¶ 47.) Nissan argues that, because Chambers did not pay for the vehicle or any repairs, he has not alleged an injury for the purposes of section 349.

The plaintiffs respond that Chambers faces most of the same injuries that the other plaintiffs do. Because he was not the vehicle's purchaser, he was not personally deprived of the benefit of any bargain that he personally made. Other than that, however, he is simply an ordinary Nissan Rogue owner, and the injuries he has accrued are unrelated to whether or not he paid for his vehicle in the first instance. Although his CVT has been replaced, he asserts that the replacement CVT is "equally defective." (Id.) The value of his property, therefore, is still diminished, and he still faces future costs associated with an actually effective replacement. He was, moreover, deprived of the use of his valuable property for a period of several months. Section 349 is clear in its granting of a cause of action to any injured person, not simply a purchaser, and Chambers has alleged actual injuries. Therefore, his claim will not be dismissed.

### 7. Florida Deceptive and Unfair Trade Practices Act

Unlike most of Nissan's state-specific arguments, Nissan's argument regarding the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") does not involve the sufficiency of the plaintiff's injury, but the timeliness of her claim. FDUTPA claims are subject to a four-year statute of limitations. *See Point Blank Sols., Inc. v. Toyobo Am., Inc.*, No. 09-61166-CIV, 2011 WL 1833366, at *6 (S.D. Fla. May 13, 2011). Lee Sevigny purchased his 2017 Nissan Rogue Sport in Sarasota, Florida, in February 2018, and he brought his claims in September 2022. (Doc. No. 25 ¶ 25.) Accordingly, if the statute of limitations began to run at the time of

purchase—which Nissan argues that it did—then Sevigny's FDUTPA claim is untimely by about seven months.

The plaintiffs allege that Sevigny's vehicle did not begin "experiencing the CVT Defect" until 2021. (Doc. No. 25 ¶ 26.) Courts, however, have typically held that the FDUTPA statute of limitations runs from the time of the plaintiff's actual injury, not the time of the plaintiff's "delayed discovery" of that injury. *See Brexendorf v. Bank of Am., N.A.*, 319 F. Supp. 3d 1257, 1264 (M.D. Fla. 2018) (citing *Marlborough Holdings Grp., Ltd. v. Azimut-Benetti, Spa, Platinum Yacht Collection No. Two, Inc.*, 505 F. App'x 899, 906 (11th Cir. 2013)). The core of the plaintiffs' allegations, moreover, is not simply that any individual CVT malfunctioned on a particular day, but that each CVT was defective at the time of sale. Indeed, Sevigny has affirmatively pleaded that, if he had "been informed that his vehicle suffered from the CVT Defect, he would not have purchased it." (Doc. No. 25 ¶ 25.) He, therefore, was damaged on the date of purchase, Nissan argues, because he "suffered damages when [he] purchased something that was not what [he was] led to believe [he was] purchasing." *Point Blank Sols.*, 2011 WL 1833366, at *6 (citing *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. Dist. Ct. App. 1984)).

The plaintiffs do not dispute any of those general principles. They argue, however, that Nissan should be estopped from asserting a statute of limitations defense because it "knowingly and actively concealed the CVT Defect pre-sale by promoting the CVT as a superior, smooth-running product to hide the truth and then prevented Plaintiffs and Class Members from discovering the defect post-sale." (Doc. No. 44 at 24.) Florida courts do recognize that a defendant may be estopped from asserting such a defense, but the bar for making the requisite showing appears to be relatively high—higher than the bar would be for a more conventional tolling argument based on fraudulent concealment. Specifically, "an equitable estoppel claim

33

raised in response to a statute of limitations defense must allege that the defendant acted with an intent to mislead or deceive the plaintiff into filing late, and that the plaintiff's failure to timely file is directly attributable to the defendant's misconduct." *Fox v. City of Pompano Beach*, 984 So. 2d 664, 668 (Fla. Dist. Ct. App. 2008) (collecting cases). While the plaintiffs have alleged that Nissan took many steps to deceive customers into purchasing their vehicles, they have offered little by way of allegations that Nissan acted specifically to induce plaintiffs to miss their statute of limitations cutoffs. Nor have the plaintiffs explained how the timing of Sevigny's claim could be directly attributable to Nissan's supposed concealment, given that the malfunctions in his vehicle arose well within the statute of limitations.

Typically, "[s]tatute-of-limitations defenses are [more] properly raised in Rule 56 motions [for summary judgment], rather than Rule 12(b)(6) . . . motions, because '[a] plaintiff generally need not plead the lack of affirmative defenses to state a valid claim.'" *Munson Hardisty, LLC v. Legacy Pointe Apartments, LLC*, 359 F. Supp. 3d 546, 567 (E.D. Tenn. 2019) (quoting *Paulin v. Kroger Ltd. P'ship I*, No. 3:14-cv-669, 2015 WL 1298583, at *4 (W.D. Ky. Mar. 23, 2015)). However, if it is "'apparent from the face of the complaint that the time limit for bringing the claim[s] has passed,'" then the plaintiff, if he wishes to avoid dismissal, has an "obligation to plead facts in avoidance of the statute of limitations defense." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 520 (6th Cir. 2008) (quoting *Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 744 (6th Cir. 1992)). When "the allegations in the complaint affirmatively show that a claim is time-barred," then "dismissing the claim under Rule 12(b)(6) is appropriate." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012).

Sevigny's FDUTPA claim is, in on its face, untimely, meaning that he has an obligation to explain why it is not. He has, however, failed to do so. He has, at most, set forth facts that

might support a tolling argument based on the fact that Nissan fraudulently concealed the defect, if such an argument were available. The plaintiffs, however, have not identified any authority suggesting that Florida recognizes tolling based on concealment in the context of his FDUTPA claim. That lack of authority is particularly compelling, given that "[t]he Florida legislature has set forth specific grounds for tolling limitations periods," which have been held to "'preclude[] application of any tolling provision not specifically provided therein.'" *Koski v. Carrier Corp.*, 347 F. Supp. 3d 1185, 1192 (S.D. Fla. 2017) (quoting *Hearndon v. Graham*, 767 So. 2d 1179, 1185 (Fla. 2000)). That list of statutory grounds for tolling does not include fraudulent concealment. *See* Fla. Stat. Ann. § 95.051. A holding that a defendant is estopped from asserting a statute of limitations defense is distinct from a holding that the statute of limitations was actually tolled, so the estoppel argument remains available in appropriate cases. Sevigny, however, has not set forth facts sufficient to make a plausible assertion that this is such a case. The court, therefore, will dismiss the Tenth Cause of Action, which states his FDUTPA claim.[5]

### 8. Texas Deceptive Trade Practices Act

In order to prevail on a claim under the Texas Deceptive Trade Practices Act ("TDTPA"), a plaintiff must establish that "(1) the plaintiff is a consumer; (2) the defendant engaged in false, misleading, or deceptive acts; and (3) the deceptive acts constituted a producing cause of the consumer's damage." *Gallegos v. Quintero*, No. 13-16-00497-CV, 2018 WL 655539, at *3 (Tex. App. Feb. 1, 2018) (citing Tex. Bus. & Com. Code Ann. § 17.46(b); *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995)). Dorothy Ards has asserted a TDTPA claim that follows the same blueprint as the other plaintiffs' claims under the laws of other states. (Doc. No. 25 ¶¶ 354–372.) Nissan has devoted a section of its briefing to

---

[5] Because the court is dismissing this claim as untimely, the court will not consider Nissan's alternative argument that the claim runs afoul of Florida's version of the economic loss doctrine.

arguments that it identifies as directed at Ards' claim, but the arguments included in that section simply recapitulate the general arguments that the company has raised regarding identification of the CVT's defect, sufficient pleading of knowledge, and whether or not the plaintiffs' vehicles were merchantable. (Doc. No. 35 at 24–25.) Those arguments are unavailing for the reasons set out elsewhere in this opinion.

### 9. Maryland, Tennessee, North Carolina, and Florida Fraudulent Omission Claims

Most of Nissan's arguments regarding the adequacy of the plaintiffs' injuries involve state consumer protection statutes. However, Nissan argues that the versions of the economic loss doctrine recognized in Maryland, Tennessee, and North Carolina preclude recovery of purely economic damages in the context of claims for fraudulent omission as well. The plaintiffs dispute this reading of each state's laws.

**Maryland.** Nissan bases its reading of Maryland law on a district court decision from 1983. (*See* Doc. No. 35 at 26 n.11 (citing *Copiers Typewriters Calculators, Inc. v. Toshiba Corp.*, 576 F. Supp. 312, 326 (D. Md. 1983)). A review of more recent caselaw, however, reveals at least two flaws in Nissan's argument. First, modern formulations of Maryland's rule have tended to include the acknowledgment of an exception for cases involving fraud and deceit. *See, e.g.*, *UBS Fin. Servs., Inc. v. Thompson*, 217 Md. App. 500, 531, 94 A.3d 176, 194 (2014), *aff'd*, 443 Md. 47, 115 A.3d 125 (2015). Second, Maryland does not apply the economic loss rule if the defect at issue "creates a substantial and unreasonable risk of death or personal injury." *Lloyd v. Gen. Motors Corp.*, 916 A.2d at 266 (quoting *U.S. Gypsum Co. v. Mayor & City Council of Baltimore*, 336 Md. 145, 155, 647 A.2d 405, 410 (1994)). Either rationale is sufficient to permit Stockley's Maryland fraud claim to proceed.

36

**Tennessee.** After briefing was completed in this case, the Tennessee Supreme Court decided *Commercial Painting Co. Inc. v. Weitz Co. LLC*, 2023 WL 6304838, in which the Court substantially clarified the application of the economic loss doctrine in Tennessee. The court held, first, that "the economic loss doctrine only applies in products liability cases and should not be extended to other claims." *Id.* at *12. The court spoke in terms of types of case, not particular causes of action, suggesting that any tort, common law or statutory, asserted in a products liability case is potentially subject to the rule, unless a particular exception applies.

Here, however, an exception does apply—as other portions of the Tennessee Supreme Court's decision confirm. Specifically, the court noted criticisms that the economic loss doctrine had garnered in the area of fraud claims, and the court reiterated that Tennessee has only recognized the applicability of thr doctrine to fraudulent inducement claims if the underlying dispute is between "sophisticated commercial business entities." *Id.* at *9 (quoting *Milan Supply Chain Sols., Inc. v. Navistar, Inc.*, 627 S.W.3d 125, 154 (Tenn. 2021)). Otherwise, the policy of the State of Tennessee is that "[o]ne party need not have to consider another party's fraud among the potential risks and costs when negotiating a contract in good faith." *Id.* at *10. The Tennessee plaintiff, Brianna Williams, is an ordinary consumer, not a sophisticated commercial entity, and she alleges that she was fraudulently induced to purchase her Nissan Rogue. (*See* Doc. No. 25 ¶ 13 ("Had Ms. Williams been informed that her vehicle suffered from the CVT Defect, she would not have purchased it.").) Her claim, therefore, is not barred by the economic loss doctrine.

**North Carolina.** Nissan's arguments regarding the application of North Carolina's economic loss doctrine to Elizabeth Burns' fraud claim fail for the same reason: North Carolina courts have affirmatively held that the doctrine does not apply to allegations of fraud. *Bradley Woodcraft, Inc. v. Bodden*, 251 N.C. App. 27, 34, 795 S.E.2d 253, 259 (2016). Burns, like

37

Williams, has alleged that Nissan's fraudulent omission of information regarding the CVT defect induced her to purchase a vehicle she otherwise would not have purchased. (Doc. No. 25 ¶ 16.) Her claim for fraud, therefore, can proceed.

**Florida.** The plaintiffs argue that Florida law similarly recognizes a carveout from its economic loss doctrine for cases in which a plaintiff alleges that he was fraudulently induced into entering into the relevant purchase agreement. Although the Florida Supreme Court does not appear to have definitively addressed that issue, the Eleventh Circuit has interpreted Florida law to reflect the plaintiffs' position that a "a fraudulent inducement claim" that is "independent of a breach of contract claim" is not subject to the economic loss doctrine. *Glob. Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022, 1031 (11th Cir. 2017); *see also Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 947 (11th Cir. 2014). Nissan, in its Reply, identifies no reason to doubt that reading. The court, therefore, will allow this claim to proceed.

### 10. Ohio Negligence Claim

Most of the allegations in this case involve Nissan's knowing actions—specifically, its decision to sell Nissan Rogue models that it knew suffered from a defective transmission, as well as its decision to advertise and market those models in a way that did not disclose the risks that that defect created. The plaintiffs' Thirteenth Cause of Action, however, is for negligence. (Doc. No. 25 ¶ 256–63.) The only named plaintiff who asserts that cause of action is Simms, who does so under Ohio law. Nissan argues that this claim is barred by the economic loss doctrine. Because the claim asserts only negligence, Simms cannot rely on any exception to that doctrine for fraud or other intentional torts. Instead, she argues that her claim can proceed pursuant to another limitation on Ohio's version of the doctrine: the rule that, "in Ohio, ordinary consumers who lack privity with a product's manufacturer may bring a claim for negligent design and

38

failure to warn even though they plead only economic losses." *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 684 F. Supp. 2d 942, 950 (N.D. Ohio 2009) (internal quotation omitted). According to that rule, the plaintiffs argue, Simms' claim can proceed, because, while she was the beneficiary of a Nissan warranty, she was not in direct privity with the company.

Nissan does not address Simms' privity argument in its Reply. Its discussion of privity in the context of other arguments, however, confirms that it accepts the general proposition that the plaintiffs' Nissan warranties do not establish privity. (Doc. No. 49 at 12–13.) The court, therefore, will treat this issue as conceded by Nissan for the purposes of the motion to dismiss.[6]

## C. Breach of Implied Warranties

### 1. Lack of Merchantability

Each of the states at issue in this case has adopted a version of the Uniform Commercial Code's ("UCC") ordinary implied warranty of merchantability, which includes a guarantee that the goods sold are "fit for the ordinary purposes for which such goods are used." Ga. Code Ann. § 11-2A-212(2)(c); Fla. Stat. Ann. § 672.314(2)(c); 810 Ill. Comp. Stat. Ann. 5/2-314(2)(c); Mass. Gen. Laws ch. 106 § 2-314(2)(c); Md. Code Ann., Com. Law § 2-314(2)(c); N.C. Gen. Stat. Ann. § 25-2-314(2)(c); N.Y. U.C.C. Law § 2-314(2)(c); Ohio Rev. Code Ann. § 1302.27(b)(3); Tenn. Code Ann. § 47-2-314(2)(c); Tex. Bus. & Com. Code Ann. § 2.314(b)(3). Nissan argues that the court should dismiss the plaintiffs' claims based on that implied warranty because, among other things, the plaintiffs' allegations, even if true, would only mean that their vehicles performed worse than expected—not that they were wholly unfit for ordinary use.

---

[6] The court notes that neither party has addressed the broader question of whether a cause of action for negligent design based on the common law, rather than the OCSPA, even exists anymore in Ohio, or whether that cause of action has, as some courts have held, been abolished by statute. *See, e.g.*, *Wimbush v. Wyeth*, 619 F.3d 632, 639 (6th Cir. 2010); *Michelson v. Volkswagen Aktiengesellschaft*, 2018-Ohio-1303, ¶ 29, 99 N.E.3d 475, 482; *Moeller v. Auglaize Erie Mach. Co.*, 2009-Ohio-301, ¶ 23.

39

There are, of course, many things that can go wrong with a car, ranging from minor inconveniences to catastrophic failures. Courts, accordingly, have developed caselaw to distinguish truly unfit vehicles from ones that are merely disappointing or marred by some more limited defect. On one end of the spectrum, "'[t]he weight of authority, from courts across the country," is that, if plaintiffs have "driven their cars without problems for years," then they typically "may not recover for breach of the implied warranty of merchantability.'" *Sheris v. Nissan N. Am. Inc.*, No. CIV. 07-2516 (WHW), 2008 WL 2354908, at *6 (D.N.J. June 3, 2008) (quoting *In re: Ford Motor Co. Ignition Switch Prod. Liab. Litig.*, No. 96-1814(JBS), 2001 WL 1266317, at *22 (D.N.J. Sept. 30, 1997) & collecting cases). This case does not fall under that rule, because these plaintiffs have alleged that their experiences with their Rogues were anything but "without problems." At the same time, however, none of these plaintiffs has alleged that he or she was actually wholly prevented from using his or her vehicle. The question of whether the Amended Complaint plausibly alleges a violation of the implied duty of merchantability, then, depends on where one draws the line between a vehicle that is truly unmerchantable and one that is merely disappointing or defective in some other way.

The plaintiffs argue that the allegations that they have made are sufficient to state a plausible claim that the vehicle was unfit for its ordinary purpose, as that concept applies under the UCC standard. *See Costa v. Nissan N. Am., Inc.*, No. CV 18-11523-LTS, 2019 WL 267463, at *3 (D. Mass. Jan. 18, 2019) (refusing to dismiss CVT-related implied warranty claim because "[t]he severity of these issues and the extent to which they may have rendered the vehicle unmerchantable is a question of fact") (quoting *Baranco*, 294 F. Supp. 3d at 977 (N.D. Cal. 2018)). The court agrees. Courts have generally recognized that, "[w]ith regard to automobiles, the implied warranty of merchantability not only warrants that the automobile will operate

40

effectively, but that it will provide reasonably safe transportation." *Lloyd*, 916 A.2d at 285 (citations omitted*); see also Sasso v. Tesla, Inc.*, 584 F. Supp. 3d 60, 72–73 (E.D.N.C. 2022) ("[W]here a car can provide safe, reliable transportation, it is generally considered merchantable.") (quoting *Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 297 (4th Cir. 1989)); *Costa*, 2019 WL 267463, at *3 ("When cars are involved, Massachusetts law provides that 'a breach of the implied warranty of merchantability occurs only where a defect is so basic as to render the vehicle unfit for its ordinary purpose of providing safe, reliable transportation.'") (quoting *Finigan-Mirisola v. DaimlerChrysler Corp.*, 69 Mass. App. Ct. 1111, 869 N.E.2d 632 (2007)).

The potential safety implications of unreliable acceleration are obvious and serious. Reliable, predictable acceleration is necessary to avoid potentially catastrophic accidents in a number of everyday driving situations, as many of the consumers who complained about the CVT immediately recognized. If the plaintiffs had alleged that the vehicles that they purchased were defective in some way that was merely annoying, disappointing, or inconvenient, then Nissan's argument that such problems do not pose issues of merchantability would be persuasive. This, though, is not a case in which drivers are complaining about "the mere fact that their car gave them trouble." *Walsh v. Atamian Motors, Inc.*, 10 Mass. App. Ct. 828, 828, 406 N.E.2d 733, 734 (1980). Because the CVT defect implicates core issues of driver safety, the court cannot assume that the vehicles' technical drivability categorically establishes fitness.

Nor can the court dismiss these claims based on the fact that some of the plaintiffs did not notice issues attributable to the CVT defect until significantly after the time of sale. If the facts ultimately show that any of the plaintiffs' vehicles was, in fact, in working order when purchased and only developed physical problems significantly later, then those facts might prevent recovery

41

based on the claim that the vehicle was unmerchantable at the time of purchase. The plaintiffs, however, have alleged that these problems were inherent to the CVT, which was present at the time of purchase. Moreover, because the CVT's problems more often manifested as unreliability, rather than outright vehicle failure, it is unsurprising that the problem might take some amount of time to be apparent, particularly to a driver who has just purchased the vehicle. The court, therefore, will not dismiss any plaintiffs' breach of implied warranty claim based solely on the plaintiffs' failure to plead unmerchantability under the UCC.

### 2. Massachusetts Government Standard Requirement

In *Iannacchino*, the Massachusetts Supreme Judicial Court held that a claim for breach of implied warranty in connection with a vehicle is so "actually and legally intertwined with" a statutory claim under the Mass. CPA that the claims "should survive or fail under the same analysis." *Iannacchino*, 888 N.E.2d at 889. Based on that principle, Nissan argues that the court should dismiss Munford's claim for breach of implied warranties, for the same reason that it should dismiss Munford's Mass. CPA claim: that Massachusetts law requires either a non-economic injury or an allegation that the product at issue failed to comply with an identifiable government standard. Because the court has rejected that argument with regard to the Mass. CPA, it will also reject it here.

### 3. Timeliness of Texas Claim

Nissan argues that Dorothy Ards' claim for breach of implied warranty under Texas law is barred by the four-year statute of limitations, calculated from the time of the receipt of the underlying goods, that applies to that cause of action. *See Adams v. Nissan N. Am., Inc.*, 395 F. Supp. 3d 838, 845 (S.D. Tex. 2018). In the plaintiffs' Response, they raise no argument that a Texas common law or UCC-based claim for breach of implied warranty would be timely. Rather,

they state only that "Ards' Texas implied warranty claim is alleged independently and as a violation of the Texas DTPA" and that the TDTPA claim is potentially timely under the discovery rule. The actual cause of action to which this portion of the Motion to Dismiss was directed, however—the Twenty-Third Cause of Action—cites only the UCC. (Doc. No. 25 at 76.) The court, therefore, will dismiss that cause of action based on its uncontested untimeliness.

### 4. Lack of Privity (Illinois, New York, Tennessee)

Nissan argues that three of the states at issue in this case—Tennessee, New York, and Illinois—require privity between parties in order for a plaintiff to assert a claim for breach of implied warranty for economic losses. *See Voelker v. Porsche Cars N. Am., Inc.*, 353 F.3d 516, 525 (7th Cir. 2003) ("Under the law of Illinois, privity of contract is a prerequisite to recover economic damages for breach of implied warranty.") (citation omitted); *Americoach Tours, Inc. v. Detroit Diesel Corp.*, 2005 WL 2335369, at *6 (W.D. Tenn. Sept. 23, 2005) ("Tennessee law does not allow recovery of economic losses under a breach of warranty theory absent privity . . . .") (citation omitted); *Harris v. Pfizer Inc.*, 586 F. Supp. 3d 231, 245 (S.D.N.Y. 2003) ("Under New York law, a claim for breach of implied warranty requires privity, unless the claim arises out of a personal injury.") (citation omitted). As the court has already noted, the parties are in agreement that there is no direct privity between the plaintiffs and Nissan. Whether this argument should prevail, therefore, depends on whether Nissan has accurately set out the law of those states.

**Tennessee.** The plaintiffs raise no counterargument regarding Tennessee law, and the court will, therefore, dismiss that claim, the First Cause of Action.

**New York.** The plaintiffs do not dispute the general rule that New York law requires privity for breach of implied warranty claims, but they argue that the state recognizes an

43

exception when the underlying product is a "thing of danger." The courts that have considered whether such an exception exists have been split. *See Falk v. Nissan N. Am., Inc.*, No. 17-CV-04871-HSG, 2018 WL 2234303, at *4 (N.D. Cal. May 16, 2018) (collecting cases). The actual authority for such an exception based on the caselaw of New York courts—as opposed to federal courts guessing as to New York law—appears to be scant. The most recent New York court case that the plaintiffs cite on this issue was decided in 1963. (Doc. No. 44 at 32 (citing *Goldberg v. Kollsman Instrument Corp.*, 191 N.E.2d 81, 82-83 (N.Y. Ct. App. 1963)).) The doctrine has been mentioned in two recent New York Court of Appeals dissents, but only in the context of discussing historical developments even older than the 1963 case. *See Nonhuman Rts. Project, Inc. v. Breheny*, 38 N.Y.3d 555, 614, 197 N.E.3d 921, 958 (2022) (Wilson, J., dissenting); *iFasolas v. Bobcat of New York, Inc.*, 33 N.Y.3d 421, 437, 128 N.E.3d 627, 638 (2019) (Rivera, J., dissenting). A thorough recent review by the Northern District of New York, moreover, ultimately concluded that there was no support for such an exception. *See Cummings v. FCA US LLC*, 401 F. Supp. 3d 288, 311–13 (N.D.N.Y. 2019). This court agrees. The lack of support for such a rule in modern New York caselaw is glaring, and the Northern District of New York has convincingly explained why such an exception appeared, at one time, to be potentially viable, before the law of products liability in the state ultimately passed it by. The court, therefore, will dismiss the Twenty-First Cause of Action, which states Sean Chambers' claim for breach of implied warranty.

**Illinois.** The plaintiffs similarly do not dispute Nissan's statement of the general rule applicable to implied warranty claims in Illinois. Instead, they offer two arguments in favor of finding an exception in this instance. The first argument is based on a decades-old case that suggested that the boundaries of an Illinois plaintiff's implied warranty claim change, for these

44

purposes, when a plaintiff asserts a federal MMWA claim. (*See* Doc. No. 44 at 33 (citing *Szajna v. General Motors, Corp.*, 503 N.E.2d 760, 769-70 (Ill. 1986)).) As Nissan points out, however, that approach has been "overwhelmingly rejected" by later courts. *Smith v. Monaco Coach Corp.*, 334 F. Supp. 2d 1065, 1069 (N.D. Ill. 2004) (collecting cases).

In the alternative, the plaintiffs argue that the Illinois privity requirement does not apply "where the manufacturer is 'aware of remote customers' requirement that their' products function safely and for their intended purpose." (Doc. No. 44 at 33 (quoting *Elward v. Electrolux Home Prods., Inc.*, 214 F. Supp. 3d 701, 706 (N.D. Ill. 2016)).) This exception, however, does not apply to situations where the manufacturer merely knew, generally, that consumers would expect their product to work; such an exception would entirely swallow the rule. Rather, it applies to the much narrower set of cases, "where the manufacturer knew the identity, purpose and requirements of the dealer's customer and manufactured or delivered the goods specifically to meet those requirements." *Elward*, 214 F. Supp. 3d at 705 (quoting *Frank's Maint. & Eng'g, Inc. v. C. A. Roberts Co.*, 86 Ill. App. 3d 980, 992, 408 N.E.2d 403, 412 (1980)). Nissan, however, did not make the 2019 Nissan Rogue Sport specifically for plaintiff Love. The plaintiffs, therefore, have failed to identify an exception to Illinois' rule that privity is required to support a claim for breach of implied warranty, and that claim—the Seventeenth Cause of Action—will be dismissed.

## D. Express Warranties

The mere fact that a vehicle covered by a warranty has malfunctioned does not, alone, support recovery for breach of express warranty. Typically, the plaintiff must also show that the defendant received "(1) notice of the defect and (2) a reasonable opportunity to repair the defect." *Knight v. Am. Suzuki Motor Corp.*, 272 Ga. App. 319, 322, 612 S.E.2d 546, 549 (2005)

(collecting authorities). Three of the plaintiffs—Williams, Burns, and Ards—sought no repairs for their vehicles, and the plaintiffs, presumably in recognition of that fact, have not brought breach of express warranty claims on behalf of those plaintiffs. The other plaintiffs did seek repairs, but each did so only once during the warranty period. (*See* Doc. No. 25 ¶¶ 20, 26, 31, 39, 47, 52, 206.) Nissan argues that these attempts did not amount to a sufficient opportunity to repair the vehicles.

The individual plaintiffs' allegations regarding how Nissan dealerships reacted to their complaints, however, readily explain why a reasonable customer, in their position, would have been unlikely to seek such assistance again. For example, when Sevigny complained to a dealership, he was told—falsely—that there was nothing wrong with his vehicle. (*Id.* ¶ 26.) The same thing happened to Munford and Jenna Haines. (*Id.* ¶¶ 20, 52.) The dealer that Love sought out "downplayed her complaints and failed to diagnose any transmission problems or perform any repairs." (*Id.* ¶ 31.) Simms' dealership also failed to diagnose the problem, and Stockley's offered her no repairs. (*Id.* ¶¶ 39, 206.) It would be one thing if those Nissan dealerships had made some effort to take the issue seriously and had simply fallen short in their initial repair efforts. A reasonable finder of fact, however, could conclude that the dealerships' outright refusal to acknowledge the issue and/or offer appropriate repairs establish a violation of the warranty.

Chambers' dealership in New York did respond to his complaints, but its response poses another obstacle to Nissan's argument that it should have been granted more opportunities to rectify the situation. Chambers' dealership entirely replaced his CVT with another CVT—a process that took three months—only for that CVT to be "equally defective." (*Id.* ¶ 47.) The court cannot conclude, as a matter of law, that Chambers was required to keep going back to his

46

dealership for additional, lengthy interludes in which his vehicle was out of commission while a defective part was replaced with a no-less-defective version of the exact same system. The court, accordingly will not dismiss the breach of express warranty claims based on an insufficient opportunity to repair.

## E. Magnuson-Moss

The Magnuson–Moss Warranty Act "creates a federal right of action for violation of the Act's terms, as well as for breaches of warranty arising from state substantive law." *Kuns v. Ford Motor Co.*, 543 F. App'x 572, 575 (6th Cir. 2013) (15 U.S.C. § 2310(d)(1)). Unless a plaintiff is pursuing a claim premised on the violation of a specific Magnuson-Moss requirement, "the elements that a plaintiff must establish to pursue a cause of action . . . are the same as those required by" state law for a breach of warranty claim. *Id.* A claim pursuant to the MMWA is also subject to the same statute of limitations applicable to the corresponding state-law claim. *See Grover v. BMW of N. Am., LLC*, 434 F. Supp. 3d 617, 630 (N.D. Ohio 2020). Based on those principles, Nissan asks the court to dismiss the plaintiffs' MMWA claims that correspond to any dismissed state-law warranty claims. The court will do so and will dismiss any MMWA claims based on the First, Seventeenth, Twenty-First, or Twenty-Third Cause of Action.

## F. Unjust Enrichment

Unjust enrichment is a quasi-contractual theory of recovery and is, therefore, generally unavailable if "a valid contract" to which the plaintiff and defendant were both parties "covers the subject matter of the parties' dispute." *Harrison v. Massachusetts Bay Transportation Auth.*, No. 1884CV02939BLS2, 2020 WL 4347511, at *7 (Mass. Super. June 18, 2020) (citation omitted). Nissan argues that unjust enrichment is unavailable in this case, because each vehicle was subject to an express warranty covering the relevant subject matter.

47

In response, the plaintiffs point out that courts routinely allow plaintiffs to pursue contractual claims and unjust enrichment claims as alternative theories of recovery. That is true, but it does not mean that doing so is appropriate in every case. If there is any reasonable possibility of the parties' disagreeing about whether a contract exists, whether it binds a particular party, or whether it reaches a certain subject matter, then there may well be plausible scenarios in which a plaintiff alleging breach of contract would nevertheless succeed under an unjust enrichment theory. Such a claim must be allowed to proceed based on the principle that "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). A claim pleaded in the alternative, however, is just like any other claim challenged pursuant to Rule 12(b)(6) and must be dismissed if the operative complaint pleads no plausible version of the facts that would support that claim.

The plaintiffs have specifically alleged that Nissan sold each of the vehicles at issue in this case with a powertrain warranty that covered the CVT. There is, accordingly, no plausible reading of the allegations of the Complaint, or any subset of those allegations, that would support a conclusion that the subject matter of this case was not covered by the warranties themselves. There is, therefore, no basis for permitting the unjust enrichment claims to proceed as an alternative theory of liability, and the court will dismiss all such claims.

## IV. CONCLUSION

For the foregoing reasons, Nissan's Motion to Dismiss (Doc. No. 34) will be granted in part and denied in part. The First, Tenth, Seventeenth, Twenty-First, Twenty-Third, and Twenty-Sixth Causes of Action will be dismissed, and the Twenty-Fifth Cause of Action will be dismissed, in part, as to the breach of implied warranty-based MMWA claims of Williams, Love, Ards, and Chamber.

48

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge